## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-00497 (ABJ)** |
| **v.** | : | |
| | : | |
| **ANTHONY ANTONIO,** | : | |
| | : | |
| **Defendant.** | : | |

### UNITED STATES' OMNIBUS MOTIONS *IN LIMINE*

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits these omnibus motions *in limine* in advance of the trial in this case scheduled for January 8, 2024.

### I.      Motion *in Limine* To Admit Certain Categories of Multimedia

On December 11, 2023, the United States will provide its preliminary exhibit list to the defendant and to the Court. *See* ECF No. 48. The United States anticipates, on this date, identifying, and providing to the defense, certain categories of photographic and video exhibits that it intends to offer at trial. The following sections describe each category of evidence and explain why each is admissible as relevant and authentic.

#### A.      Legal Framework

"As a general rule, tangible evidence such as photographs must be properly identified or authenticated before being admitted into evidence at trial." *United States v. Blackwell*, 694 F.2d 1325, 1329 (D.C. Cir. 1982). To satisfy this requirement, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid.

901(a).   Rule 901(b) provides a non-exhaustive list of examples of methods for showing

authenticity.  Those include, as relevant here:

> (1) Testimony of a Witness with Knowledge.  Testimony that an item is what it is claimed
> to be.
>  . . . .
> (3) Comparison by an Expert Witness or the Trier of Fact.  A comparison with an
> authenticated specimen by an expert witness or the trier of fact.
>
> (4) Distinctive Characteristics and the Like.  The appearance, contents, substance, internal
> patterns, or other distinctive characteristics of the item, taken together with all the
> circumstances.
>  . . . .
>
> (7) Evidence About Public Records.  Evidence that: (A) a document was recorded or filed
> in a public office as authorized by law; or (B) a purported public record or statement is
> from the office where items of this kind are kept.
>  . . . .
>
> (9) Evidence About a Process or System.  Evidence describing a process or system and
> showing that it produces an accurate result.

Fed. R. Evid. 901(b).

In making the showing necessary for admissibility, "the proponent's 'burden of proof'" is

"slight," and the "ultimate resolution of the evidence's authenticity is reserved for the jury."

*United States v. Hassanshahi*, 195 F. Supp. 3d 35, 48 (D.D.C. 2016) (quoting *McQueeney v.*

*Wilmington Tr. Co.*, 779 F.2d 916, 928 (3d Cir. 1985)); *United States v. Safavian*, 435 F. Supp. 2d

36, 38 (D.D.C. 2006).  To make the requisite prima facie showing, "circumstantial evidence of

authenticity can be sufficient."  *United States v. Bruner*, 657 F.2d 1278, 1284 (D.C. Cir. 1981).

And such evidence need not "rule out all possibilities inconsistent with authenticity, or to prove

beyond any doubt that the evidence is what it purports to be," *Hassanshahi*, 195 F. Supp. 3d at 48

(quoting *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999)).  Rather, the party offering the

evidence need only "demonstrate that, as a matter of reasonable probability, possibilities of

misidentification and adulteration have been eliminated." *United States v. Celis*, 608 F.3d 818, 842 (D.C. Cir. 2010) (quoting *United States v. Stewart*, 104 F.3d 1377, 1383 (D.C. Cir. 1997)).

**B.    Overlapping Bases for Admissibility of Multimedia**

As introduced herein, there are multiple, overlapping bases that the United States intends to use for the authentication and introduction of photographs and videos at trial.  The United States offers this nonexclusive list of bases for authentication should the United States be unable to enter into stipulations with the defendant in advance of trial.

**1.  Authentication by a Witness with Knowledge**

To begin, any witness with knowledge of the events depicted in a photograph or video can authenticate the evidence, including but not limited to the person who took the photograph or video.  *See* Fed. R. Evid. 901(b)(1).  Here, that includes any person who was present for the events depicted in the photograph or video and has a recollection sufficient for them to recognize the scene depicted.  *See, e.g.*, *Am. Wrecking Corp. v. Sec'y of Lab.*, 351 F.3d 1254, 1262 (D.C. Cir. 2003).  Any individual that observed the events depicted in the photograph or video can testify that the photograph or video appears to fairly and accurately show the events that took place.  *See* FRE 901(b)(1); *see also United States v. Rembert*, 863 F.2d 1023, 1026 (D.C. Cir. 1988).

Even a person who was not present for a specific event can circumstantially establish the authenticity of a photograph or video depicting that event if they can (1) identify the location(s) depicted in the video; and (2) establish that the video is generally consistent with their knowledge of events that occurred during the Capitol riot.  *See, e.g.*, *Rembert*, 863 F. 2d at 1028 ("Even if direct testimony as to foundation matters is absent . . . the contents of a photograph itself, together with such other circumstantial or indirect evidence as bears upon the issue, may serve to explain and authenticate a photograph sufficiently to justify its admission into evidence." (alteration in

original) (quoting *United States v. Stearns*, 550 F.2d 1167, 1171 (9th Cir. 1977) (Kennedy, J.)));

*United States v. Holmquist*, 36 F.3d 154, 169 (1st Cir. 1994) ("A photograph's contents, buttressed

by indirect or circumstantial evidence, can form a sufficient basis for authentication even without

the testimony of the photographer or some other person who was present at the time it was taken.").

On this authority, the United States could authenticate riot footage through, for example, the

testimony of an experienced U.S. Capitol Police officer who is familiar with all areas of the Capitol

and who knows that the events of January 6 are unique in modern history.  *Cf. Safavian*, 435 F.

Supp. 2d at 40–42 (authenticating emails based on "distinctive characteristics" and citing Fed. R.

Evid. 901(b)(4)); *Klayman v. Judicial Watch*, 299 F. Supp. 3d 141, 145–46 (D.D.C. 2018)

(admitting emails and advertisements by comparing later versions with admitted versions).  Again,

this is a low bar that requires only a prima facie showing that the evidence is what the United States

purports it to be—namely, photographs and videos of the Capitol siege in progress.

## 2.  Authentication by Metadata

Where necessary, the United States can also authenticate the specific time or place of a

photograph or video using metadata.  When a digital media file is extracted from a device or

otherwise seized by the government, it often contains metadata that specifies the time, and

sometimes place, the file was created, along with other information.  At trial, the United States

will sometimes call law enforcement personnel to testify about the process of extracting data from

digital devices and reviewing the extracted materials.  Such testimony is sufficient to make a prima

facie showing that a photograph or video was made at the time or place reflected in the metadata.

*See, e.g.*, *United States v. Banks*, 43 F.4th 912, 918 (8th Cir. 2022) ("While the officers were not

present when the images and videos were first captured, their testimony [about reviewing

extraction reports] provided a rational basis to believe that the exhibits had been created within the

relevant time frame and stored on [the defendant's] cellular phones."); *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 547–48 (D. Md. 2007) ("Because metadata shows the date, time and identity of the creator of an electronic record, as well as all changes made to it, metadata is a distinctive characteristic of all electronic evidence that can be used to authenticate it under Rule 901(b)(4)."); *United States v. Gilbreath*, No. 3:19-CR-127-TAV-HBG, 2020 WL 5441226, at *3 (E.D. Tenn. Sept. 10, 2020) ("Metadata . . . showed that these images were created at defendant's home and on defendant's cell phone on September 12, 2015.").

### 3. Authentication by Comparison

Similarly and alternatively, in instances where precision of time and place is relevant but cannot be established by a witness with knowledge or by the media's metadata, the United States will authenticate exhibits by reference to other, already-authenticated exhibits depicting the same time and place. This method of "[a]uthentication by comparison is routine." *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1371 (Fed. Cir. 2021); *see also United States v. Hoyt*, 946 F.2d 127, at *1 (D.C. Cir. 1991) (unpublished) (noting that Fed. R. Evid. 901(b)(3) permits authentication by comparison); *Stearns*, 550 F.2d at 1171 (finding that first picture "authenticates the other four pictures as to time"); *Safavian*, 435 F. Supp. 2d at 40 (allowing authentication of emails by means of comparison with other "e-mails that already have been independently authenticated").

### 4. Authentication Based on a Process or System that Produces an Accurate Result

Certain multimedia, such as security cameras (CCTV) operated by the U.S. Capitol Police (USCP) and body-worn cameras (BWC) worn by officers of the Metropolitan Police Department (MPD) can be authenticated by "describing a process or system and showing that it produces an accurate result," Fed. R. Evid 901(b)(9). *See United States v. Dale*, 991 F.2d 819, 843 (D.C. Cir.

5

1993) ("Tapes may be authenticated by testimony describing the process or system that created the tape."); *United States v. Pinke*, 614 F. App'x 651, 653 (4th Cir. 2015) (unpublished) (finding "sufficient evidence of authentication" of a prison's closed circuit video where "a Government witness explained the manner in which the prison's closed circuit video system operates, the means by which he obtained the video, and that he downloaded it onto the DVD that was played for the jury."). These types of evidence can be authenticated through certification under Federal Rule of Evidence 902. Alternatively, USCP and MPD witnesses to be called by the United States are available to testify to the systems employed by USCP and MPD, respectively. These witnesses will be able to explain how the system is used, that it reliably records and depicts the areas that the camera faces, and the internal characteristics of videos—such as date and time stamps—which allow USCP and MPD to identify and retrieve segments of video.

### 5. Authentication Based on Status as an "Official Publication"

Certain evidence in this case, such as video taken by the Senate Recording Studio, is also "self-authenticating," meaning it "require[s] no extrinsic evidence of authenticity in order to be admitted." Fed. R. Evid. 902.[1] This is so because it qualifies as an "Official Publication[]," defined as any "book, pamphlet, or other publication purporting to be issued by a public authority." Fed. R. Evid. 902(5). Official materials published on government websites fall into this category and are self-authenticating under Rule 902. *See Williams v. Long*, 585 F. Supp. 2d 679, 685–90 (D. Md. 2008); *cf. MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486, 503–04 (S.D.N.Y. 2017) (Congressional transcripts); *Singletary v. Howard Univ.*, No. 1:17-cv-01198,

---

[1] Further underscoring the multiple paths to authentication, the Senate Recording Studio footage may also be authenticated through any of the mechanisms outlined in this motion, including Fed. R. Evid. 901(b)(1), (3), (4), (9).

2018 WL 4623569, at *4 n.1 (D.D.C. Sept. 26, 2018) (government-issued guidebook), *rev'd on other grounds*, 939 F.3d 287.

The United States Senate uses the Senate Recording Studio to contemporaneously record Senate proceedings and distribute those recordings to the public. *See* https://www.senate.gov/floor, last accessed Nov. 14, 2023 (publicly available archived recordings of Senate Recording Studio). The Senate Recording Studio recorded the proceedings relating to the Electoral College Certification on January 6, 2021, up to the point when the rioters breached the building and forced the proceedings into recess. *See id.*, January 6, 2021. Subsequently, the Senate Recording Studio recorded the Electoral College Certification proceedings after the rioters were cleared from the Capitol Building and the session resumed. *Id.* During the interim, the Senate Recording Studio captured footage of rioters who were present on the Senate floor during the recess. Like the CCTV and BWC footage, the Senate Recording Studio footage can be authenticated using a certification under Rule 902.

## C. Categories of Multimedia To Be Offered

The United States plans to introduce certain videos and photos recovered from the defendant's phone and social media accounts, as well as videos and photographs taken by third parties such as other rioters and journalists who were present inside and outside the Capitol on January 6. These materials can be authenticated through the processes described above.

The evidence at trial will also include video captured by law enforcement, including CCTV and BWC footage and videos captured by the Senate Recording Studio. Like any other videos, these can be authenticated by any person with direct knowledge of the scene depicted or with sufficient circumstantial knowledge, *see* Fed. R. Evid. 901(b)(1), or through metadata or comparison, *see* Fed. R. Evid. 901(b)(4). Alternatively, given the automated nature of the

recording devices in question, the BWC, CCTV, and Senate Recording Studio footage can be authenticated under Rule 901(b)(9), which allows authentication by "[e]vidence describing a process or system and showing that it produces an accurate result." Fed. R. Evid. 901(b)(9); *see Dale*, 991 F.2d at 843; *Pinke*, 614 F. App'x at 653.

## II.    Motion *in Limine* To Admit Certain Statutes and Records

### A.    Judicial Notice of the Federal Electoral College Certification Law

The proceedings that took place on January 6, 2021, were mandated by, and directed under the authority of, several constitutional and federal statutory provisions.  In fact, as Vice President Pence gaveled the Senate to Order on January 6, 2021, to proceed with the Electoral College Certification Official Proceeding, he quoted directly from, and cited to, Title 3, United States Code, Section 17.

The United States requests that the Court take judicial notice of, and admit into evidence, copies of Article II, Section 1 of the Constitution of the United States, the Twelfth Amendment, as well as 3 U.S.C. §§ 15–18 relating to the Electoral College Certification Official Proceedings. These are attached as Exhibits 1–6. It is well established that district courts may take judicial notice of law "without plea or proof." *See United States v. Davila-Nieves*, 670 F.3d 1, 7 (1st Cir. 2012) (quoting *Getty Petroleum Mktg., Inc. v. Capital Terminal Co.*, 391 F.3d 312, 320 (1st Cir. 2004)). The United States makes this request even though "no motion is required in order for the court to take judicial notice." *Moore v. Reno*, No. 00-5180, 2000 WL 1838862, at *1 (D.D.C. Nov. 14, 2000).   Further, "where a federal prosecution hinges on an interpretation or application of state law, it is the district court's function to explain the relevant state law to the jury." *See United States v. Fazal-Ur-Raheman-Fazal*, 355 F.3d 40, 49 (1st Cir. 2004).

**B.      Admission of the Congressional Record and S. Con. Res. 1**

The Congressional proceedings on January 6, 2021, were memorialized in the Congressional Record.  The Congressional Record is a public record under Federal Rule of Evidence 902(5).  *See MMA Consultants*, 245 F. Supp. 3d at 503–04.  The United States intends to introduce portions of the Congressional Record at trial, including the bodies' "concurrent resolution to provide for the counting on January 6, 2021, of the electoral votes for President and Vice President of the United States," S. Con. Res. 1, 117th Cong. (2021).  For the same reasons as the Senate Recording Studios footage above, these records should be admitted as self-authenticating.

**III.     Motion *in Limine* To Limit Unnecessary Discussion of Security-Related Topics**

Certain topics that could arise at trial—namely the exact locations of USCP CCTV cameras and the protocols of the U.S. Secret Service (USSS)—have little to no probative value but would compromise significant security interests if needlessly disclosed to the public.  The United States does not intend to elicit any of the following topics in its case-in-chief and, therefore, cross-examination on such topics would be beyond the scope of direct and impermissible.  Fed. R. Evid. 611(b).  To the extent that the defendant seeks to argue that any of the following topics are relevant and within the scope of the direct examination, the United States requests an order under Fed. R. Evid. 403 foreclosing unnecessary cross-examination on these topics.

It is well-established that a district court has the discretion to limit a criminal defendant's presentation of evidence and cross-examination of witnesses.  *See Alford v. United States*, 282 U.S. 687 (1931) ("The extent of cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court."); *United States v. Whitmore*, 359 F.3d 609, 615–16 (D.C. Cir. 2004) ("The district court . . . has considerable discretion to place

reasonable limits on a criminal defendant's presentation of evidence and cross-examination of government witnesses."). A court has the discretion to prohibit cross-examination that goes beyond matters testified to on direct examination. Fed. R. Evid. 611(b). This is particularly so when the information at issue is of a sensitive nature. *See, e.g.*, *United States v. Balistreri*, 779 F.2d 1191, 1216–17 (7th Cir. 1985) (upholding district court's decision to prohibit cross-examination of agent about sensitive information about which that agent did not testify on direct examination and which did not pertain to the charges in the case), *overruled on other grounds*, *Fowler v. Butts*, 829 F.3d 788 (7th Cir. 2016).

The Confrontation Clause guarantees only "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Even evidence that may be relevant to an affirmative defense should be excluded until the defendant sufficiently establishes that defense through affirmative evidence presented during his own case-in-chief. *See United States v. Lin*, 101 F.3d 760, 768 (D.C. Cir. 1996) (acknowledging trial court has discretion to limit cross-examination on prejudicial matters without reasonable grounding in fact); *United States v. Sampol*, 636 F.2d 621, 663–64 (D.C. Cir. 1980) (holding that trial court properly limited cross-examination of alleged CIA murder scheme until defense put forth sufficient evidence of the affirmative defense in its case-in-chief). Preventing the defendant from exploring the topics identified above will not infringe his Confrontation Clause rights, because the exact positions of cameras, the camera map, and U.S. Secret Service protocols, implicate national security concerns, are of marginal probative value, and any probative value can be addressed without compromising the protective functions of government agencies.

### A.    Exact Locations of USCP Cameras

The United States seeks an order limiting the defense from probing, during cross-examination, the exact locations of U.S. Capitol Police surveillance cameras or from using the maps, which show each camera's physical location, as an exhibit at trial.  The United States produced such information to the defendant in discovery pursuant to the Highly Sensitive designation of the Protective Order.  The defendant has been able to make use of such information in order to identify evidence and prepare for trial; however, none of the information serves to illuminate any fact of consequence that is before the jury.

This lack of relevance must be balanced against the national security implications at stake here.  The U.S. Capitol Police's surveillance system serves an important and ongoing function in protecting Congress, and therefore, national security.  Furthermore, the United States represents that the maps that show the physical location of cameras have been designated as "Security Information" under 2 U.S.C. § 1979, which generally requires approval of the U.S. Capitol Police Board before they may be released.

Evidence about the exact locations of cameras, and the maps used to locate the cameras, should be excluded in light of the ongoing security needs of Congress.  Absent some concrete and specific defense need to probe the camera's location, there is nothing to be gained from such questioning.  A general description, and the footage from the camera itself, will make clear what the camera recorded and what it did not.  Additionally, presenting the map of all U.S. Capitol Police cameras would risk compromising these security concerns for no additional probative value: the map contains numerous cameras installed in parts of the Capitol that the defendant did not visit.

11

Here, the video footage itself reveals the general location and angle of the camera's positioning.  Additional details as to the precise location of the cameras are not relevant to the jury's fact-finding mission.  Even assuming the evidence that the United States seeks to exclude is marginally relevant, such relevance is substantially outweighed by the danger to national security.  The Supreme Court has recognized that trial courts' balancing should account for concerns extrinsic to the litigation, such as "witness' safety."  *Olden v. Kentucky*, 488 U.S. 227, 232 (1988) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).  Accordingly, courts have properly balanced the sensitivity of national security-related information against the probative value of such information to the case, excluding the evidence where its relevance is slight.  *See, e.g.*, *United States v. Marshall*, 544 F. Supp. 3d 1032, 1042 (D. Mont. 2021); *United States v. Mohammed*, 410 F. Supp. 2d 913, 918 (S.D. Cal. 2005); *cf. United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988) (endorsing balancing test in context of Classified Information Procedures Act).  If a map that revealed the location of all Capitol cameras were introduced in this trial, or in any trial, it would become available to the general public and foreign adversaries.  Immediately, anyone could learn about the U.S. Capitol Police's camera coverage as of January 6, 2021, and, importantly, could learn about the parts of the Capitol where cameras were not installed.  Broader presentation of evidence about camera locations could compromise national security without adding any appreciable benefit to the determination of the truth, or the veracity or bias of witnesses.

## B.    Secret Service Protocols

To meet its burden of proof at trial, the United States anticipates calling a witness from the United States Secret Service to testify that at the time of the Capitol breach, Secret Service agents were on duty to protect Vice President Mike Pence and his two immediate family members, all of

whom were present at the Capitol.  The witness will further testify about the Capitol breach's effect on the Secret Service's protection of Vice President Pence and his family members.  The purpose of this testimony will be to explain, in part, the bases for enhanced security controls at the Capitol on January 6 as well as establish an element of the charge at Count One, namely, that the civil disorder at the Capitol on January 6 interfered with a federally protected function, as well as an element of Counts Four, Five, and Six, namely that the United States Capitol and its grounds were restricted because the Vice President and members of his family were temporarily visiting.

The very nature of the Secret Service's role in protecting the Vice President and his family implicates sensitive information related to that agency's ability to protect high-ranking members of the Executive branch and, by extension, national security.  Thus, the United States seeks an order limiting the cross-examination of the Secret Service witnesses to questioning about the federally protected function performed by the Secret Service as testified to on direct exam, namely, protecting the Vice President and his family.  The United States further requests that such order preclude cross examination that would elicit information that does not directly relate to whether the Secret Service was performing that function at the Capitol on January 6, 2021.  Specifically, cross-examination should not be permitted to extend to (1) Secret Service protocols related to the locations where protectees or their motorcades are taken at the Capitol or other government buildings when emergencies occur, and (2) details about the nature of Secret Service protective details, such as the number and type of agents the Secret Service assigns to protectees.  These topics have no relevance to any issue at controversy, and even if they did, any relevance would be substantially outweighed by the danger of prejudicing the United States's legitimate interest in the safety of senior government officials.  *See* Fed. R. Evid. 403.

Cross-examination of Secret Service witnesses about extraneous matters beyond the scope of direct examination should be excluded as irrelevant or unduly prejudicial.  Specifically, the Secret Service's general protocols about relocation for safety should be excluded as irrelevant because such evidence does not tend to make a fact of consequence more or less probable.  *See* Fed. R. Evid. 401.  Similarly, evidence of the nature of Secret Service protective details is not relevant in this case.  The disorder on January 6 interfered with the Secret Service's duties to protectees in this case insofar as they were required to take evasive action of the mob.  The number or type of assigned agents on a protective detail is not relevant and could not alter the probability that there was interference with the Secret Service.  None of the other elements to be proven, or available defenses, implicates further testimony from the Secret Service.

Even assuming the evidence to be excluded is marginally relevant, such relevance is substantially outweighed by the danger of confusion of the issues, undue delay, and waste of time.  Broader cross-examination of Secret Service witnesses could compromise national security without adding any appreciable benefit to the determination of the truth, or the veracity or bias of witnesses.[2]

---

[2] If the defense believes that it is necessary to present evidence or cross-examine witnesses about the exact locations of USCP cameras or USSS procedures, the United States requests that the Court conduct a hearing in camera to resolve the issue.  Courts have found that in camera proceedings are appropriate in circumstances where security concerns like these are present.  *See United States v. Nixon*, 418 U.S. 683, 714 (1974) (affirming district court's order for in camera inspection of subpoenaed presidential materials); *United States v. Kampiles*, 609 F.2d 1233, 1248 (7th Cir. 1979) ("It is settled that in camera . . . proceedings to evaluate bona fide Government claims regarding national security information are proper."); *In re Taylor*, 567 F.2d 1183, 1188 (2d Cir. 1977) (finding that in camera proceedings "serve to resolve, without disclosure, the conflict between the threatened deprivation of a party's constitutional rights and the Government's claim of privilege based on the needs of public security"); *United States v. Brown*, 539 F.2d 467, 470 (5th Cir. 1976) (per curiam) ("This Circuit, too, has repeatedly approved the use of in camera examinations as the means for resolving the conflict between a defendant's need for evidence and the government's claim of privilege based on the needs of public security.").  At any such hearing, the defendant should be required to make a specific proffer of some relevant purpose that is not substantially

## IV.     Motion *in Limine* To Preclude The Defendant's Introduction of His Own Out-of-Court Statements as Inadmissible Hearsay

A defendant's own out-of-court statements are hearsay that cannot be admitted to prove the truth of any matter asserted.  Fed. R. Evid. 801, 802.  Although the United States may offer the defendant's statements as statements of a party opponent, Fed. R. Evid. 801(d)(2)(A), or other nonhearsay, the defendant has no corresponding right to admit his own statements without subjecting himself to cross-examination.

### A.     The Rule of Completeness Cannot Circumvent the Rule Against Hearsay

Nor does Federal Rule of Evidence 106, the "Rule of Completeness," provide an end-run around the prohibition against hearsay.  That rule provides that, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."  Fed. R. Evid. 106.  Rule 106 directs the Court to "permit such limited portions [of a statement] to be contemporaneously introduced as will remove the distortion that otherwise would accompany the prosecution's evidence."  *United States v. Sutton*, 801 F.2d 1346, 1369 (D.C. Cir. 1986).  The rule does not "empower[] a court to admit unrelated hearsay."  *United States v. Woolbright*, 831 F.2d 1390, 1395 (8th Cir. 1987).  "[T]he provision of Rule 106 grounding admission on 'fairness' reasonably should be interpreted to incorporate the common-law requirements that the evidence be relevant, and be necessary to qualify or explain the already introduced evidence allegedly taken out of context . . . .  In almost all cases we think Rule 106 will be invoked rarely and for a limited purpose."  *Sutton*, 801 F.2d at 1369.

---

outweighed by the prejudice that disclosure would inflict on the United States's security interests. *Cf. United States v. Willie*, 941 F.2d 1384, 1393 (10th Cir. 1991) (explaining that a "proffer of great specificity" was necessary to support admission of testimony that could have proper or improper purposes).

In this case, many of the defendant's statements to be offered by the United States were made in chat groups, or using social media accounts, that were active over extended periods of time. Rule 106 does not make all statements within these groups and accounts admissible over a hearsay objection, but only those narrow portions that are necessary to "correct a misleading impression." *Sutton*, 801 F.2d at 1368 (quoting Rule 106 advisory committee notes). By way of analogy, Courts of Appeals have rejected the notion that "all documents contained in agglomerated files must be admitted into evidence merely because they happen to be physically stored in the same file." *Jamison v. Collins*, 291 F.3d 380, 387 (6th Cir. 2002) (quoting *United States v. Boylan*, 898 F.2d 230, 257 (1st Cir. 1990)).

Accordingly, at trial the Court should reject any effort by the defendant to use the Rule of Completeness as a backdoor to admit otherwise inadmissible hearsay.

### B. Law Enforcement Testimony Cannot Circumvent the Rule Against Hearsay

Another mechanism by which the United States anticipates that the defendant may attempt to introduce his own prior statements is through the testimony of law enforcement officers with whom the defendant had communications. The United States anticipates that the defendant may seek to call law enforcement officers or agents, at least in part, to elicit self-serving statements made by the defendant to law enforcement about his travels to Washington, D.C. Any such statements by the defendant, if offered for the truth of the matter asserted, would be inadmissible hearsay.

An equally defective mechanism by which the defendant might attempt to introduce his own prior statements would be to elicit lay opinion testimony from the officers or agents. As an initial matter, such testimony would likely be irrelevant and inadmissible on that basis. Additionally, if such opinions are predicated on self-serving statements by the defendant, the

opinion testimony is likewise inadmissible as a vehicle to admit the defendant's hearsay.   The

Federal Rules of Evidence allow only expert witnesses to offer opinions based on otherwise-

inadmissible evidence, Fed. R. Evid. 703, and even in that context, expert opinion testimony

cannot be a backdoor for hearsay.  *See Gilmore v. Palestinian Interim Self-Government Authority*,

843 F.3d 958, 972 (D.C. Cir. 2016) ("The expert must form his own opinions by applying his

extensive experience and a reliable methodology to the inadmissible materials.   Otherwise, the

expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice

that allows the [proponent] to circumvent the rules prohibiting hearsay") (internal quotation marks

and alterations omitted) (quoting *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008); *DL v.

D.C.*, 109 F. Supp. 3d 12, 30 (D.D.C. 2015) ("An expert is entitled to rely on inadmissible evidence

in forming his or her opinion, though the expert 'must form his or her own opinions by applying

his or her extensive experience and a reliable methodology to the inadmissible materials,' rather

than simply 'transmit' the hearsay to the jury." (alterations omitted) (quoting *Mejia*, 545 F.3d at

197)).  At trial, the Court should reject any effort by the defendant to admit otherwise inadmissible

hearsay indirectly through a law enforcement officer or other percipient witness.

## V.      Motion *in Limine* To Preclude Improper Defense Arguments

### A.    First Amendment

The United States intends to admit in its case-in-chief statements that evince the

defendant's motive or intent, or which go to prove elements of the offenses with which he is

charged.  In anticipation that the defendant may oppose introduction of his statements on First

Amendment grounds, or may cite the First Amendment in arguments to the jury, the United States

also moves *in limine* to preclude the defense from eliciting evidence or arguing to the jury that his

statements and actions were protected by the First Amendment.

1.   **Admission of the Defendant's Statements Does Not Violate the First Amendment**

The United States intends to introduce several statements, made by the defendant, that will aid the jury's determination as to whether the United States has met the elements of the conspiracy statutes at issue and to show motive and intent.  *See Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) (holding that the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent").  "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like."  *Id.*  Accordingly, the United States asks that the Court rule that the First Amendment does not bar admission at trial of any statement that the United States offers to establish the defendant's motive, intent, or an element of the crime.

Courts across the country, including judges in this district in January 6th cases, have allowed evidence of the defendant's statements for the purposes sanctioned by *Mitchell*.  As Judge Cooper recently ruled:

> Nor does the Court find any First Amendment concerns in the government's use of Robertson's statements to show intent. . . . If Robertson had expressed his views only through social media, he almost certainly would not be here.  But he also allegedly took action—entering the Capitol without lawful authority in an alleged attempt to impede the Electoral College vote certification.  His words remain relevant to his intent and motive for taking those alleged actions.

*United States v. Robertson*, 588 F. Supp. 3d 114, 124 (D.D.C. 2022) (internal citation omitted).  Outside of the context of January 6th, *Mitchell* has been cited to uphold the admission of a wide range of statements, including but not limited to rap lyrics, terrorist materials, and speeches advocating civil disobedience.  *See United States v. Smith*, 967 F.3d 1196, 1205 (11th Cir. 2020) (rap lyrics); *United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015) (rap lyrics and tattoos);

*United States v. Salameh*, 152 F.3d 88, 111–12 (2d Cir. 1998) (terrorist materials); *United States v. Fullmer*, 584 F.3d 132, 158 (9th Cir. 2009) (speeches advocating civil disobedience).[3]

The defendant's statements that shed light on the elements of the offenses, or motive or intent, should be admitted in this case as expressly permitted by *Mitchell*, regardless of whether any of those statements may otherwise constitute speech protected by the First Amendment.

### 2. The Defendant Should Be Precluded from Raising a First Amendment Defense to the Jury

The United States also moves *in limine* to preclude the defendant from arguing to the jury that his conduct was protected by the First Amendment.  None of the offenses with which the defendant is charged punish speech, as crimes such as threats or solicitation do.  The crimes with which the defendant is charged punish the corrupt obstruction, influence, or impediment of an official proceeding and actions taken during the riot.

If the United States establishes the elements of any of the offenses with which the defendant is charged, the First Amendment provides him no defense, even if evidence of the defendant's crimes is intertwined with political discussion and rhetoric.  *See United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012) ("[A]lthough the conspiracy was closely related to, and indeed proved by, many of the defendant's conversations about political and religious matters, the conviction was based on an agreement to cooperate in the commission a crime, not simply to talk about it."); *see also United States v. Hassan*, 742 F.3d 104, 127–28 (4th Cir. 2014) (citing *Amawi*).

---

[3] The court in *Fullmer* specifically noted that one particular defendant's conduct—which included writing an editorial and recruiting speakers to travel and advocate on behalf of his organization—was not criminal, and that punishing him based on that conduct alone would be unconstitutional. *Fullmer*, 584 F.3d at 158.  The court nonetheless, citing *Mitchell*, held that this defendant's "conduct . . . does provide circumstantial evidence from which a jury could have reasonably inferred that Harper was involved in a conspiracy." *Id.*

Accordingly, any line of cross-examination or argument that the defendant may wish to make regarding the First Amendment is irrelevant because it lacks a "tendency to make the existence of [a] fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," Fed. R. Evid. 401, and because he is not entitled to a First Amendment defense as a matter of law.  To the extent there is any relevance to any of the defendant's First Amendment claims, the Court should exclude any questioning and argument along those lines under Fed. R. Evid. 403.  Any attempt to shift the jury's attention to questions about whether the defendant's statements were protected by the First Amendment risks confusing the issues, wasting time, and unfairly prejudicing the jury.

### B.    Charging Decisions and Selective Prosecution

The United States moves *in limine* to exclude all evidence and arguments regarding its charging decisions.  The Supreme Court has recognized that the "Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws."  *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)).  "They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'"  *Id.*  (quoting U.S. Const. Art. II, § 3); *see* 28 U.S.C. §§ 516, 547.  As a general matter, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."  *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *see also United States v. Batchelder*, 442 U.S. 114, 125 (1979) ("Selectivity in the enforcement of criminal laws is, of course, subject to constitutional constraints.").

Indeed, the D.C. Circuit has recognized that a selective prosecution claim implicates "an issue of law entirely independent of the ultimate issue of whether the defendant actually committed the crimes for which she was charged." *United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983); *see also United States v. Stone*, 394 F.Supp.3d 1, 30 n.24 (D.D.C. 2019) ("[T]he Supreme Court found that a claim of selective prosecution is not a 'defense' that triggers discovery under Rule 16, because a claim of selective prosecution is not a response to the government's case-in-chief."); *Armstrong*, 517 U.S. at 463 (noting "selective-prosecution claim is not a defense on the merits to the criminal charge"). After all, evidence that some other individual is currently uncharged or has been charged with a lesser crime than those charged here has no probative value to the issues at trial and serves only to confuse or mislead the jury. *See* Fed. R. Evid. 402, 403; *see also United States v. Reed*, 641 F.3d 992, 993–94 (8th Cir. 2011) (collecting cases and observing that "[s]everal circuits have unanimously upheld the exclusion of evidence of prior charging decisions on the ground that many factors unrelated to guilt may influence those decisions and their admission therefore risks misleading the jury and confusing the issues"); *United States v. Sutton*, No. CR 21-0598, 2022 WL 13940371, at *18 (D.D.C. Oct. 23, 2022) ("These issues are irrelevant, inappropriate for consideration by the jury, invite jury nullification, and distract from the issues at trial.").

The defendant should be precluded from introducing evidence or making arguments regarding charging decisions made by the United States. To the extent that the defendant seeks to present evidence or arguments that other individuals have not been charged for related conduct or that it is unfair that he has been charged, while other individuals involved in related criminal conduct remain uncharged or charged with lesser offenses, such evidence is irrelevant,

inadmissible, and serves only to divert the jury's attention to matters unrelated to the defendant's guilt or innocence.

### C.     Entrapment or Public Authority Defenses

In an interview that the defendant gave to CNN following January 6th, and during his initial appearance in this district, the defendant has alluded to an entrapment or public authority defense based on statements by then-President Trump or the defendant's consumption of Fox News. The Court should prohibit the defendant from making arguments or attempting to introduce evidence that any public authority gave permission to the defendant to enter the U.S. Capitol.  A public authority defense is available only where a defendant "has knowingly acted in violation of federal criminal law, but has done so in reasonable reliance on the authorization of a governmental official." *United States v. Alvarado*, 808 F.3d 474, 484 (11th Cir. 2015).  Relatedly, the defense of entrapment by estoppel applies only "to a defendant who reasonably relies on the assurance of a government official that specified conduct will not violate the law." *Id.* at 484–85.  Such reliance must be "objectively reasonable."  *United States v. Barker*, 546 F.2d 940, 948 (D.C. Cir. 1976). This defense is unavailable in this case, and the United States moves *in limine* to exclude evidence or argument targeted at such a defense.

### 1.  The Defendant Has Not Provided the Requisite Notice

Federal Rule of Criminal Procedure 12.3(a)(1) requires a defendant to provide notice if they "intend[ ] to assert a defense of actual or believed exercise of public authority on behalf of a law enforcement agency or federal intelligence agency at the time of the alleged offense."  Fed. R. Crim. P. 12.3(a)(1).  Such notice must be in writing and be filed with the clerk "within the time provided for filing a pretrial motion, or at any later time the court sets."  *Id.*  The notice must contain the law enforcement or federal intelligence agency involved, the specific agency member on whose behalf the defendant claims to have acted, and the time during which the defendant

claims to have acted with public authority.  Fed. R. Crim. P. 12.3(a)(2)(A)–(C).  A failure to comply allows the court to exclude the testimony of any undisclosed witness except the defendant. Fed. R. Crim. P. 12.3(c).  The Court set a deadline of January 23, 2023, for pretrial motions, Minute Order dated Nov. 4, 2022, and a deadline of October 27, 2023, for "[m]otions to suppress or any other motions pursuant to Rule 12(b)(3) not already file." Minute Order dated March 6, 2023. Accordingly, the time for filing the requisite notice of intent to assert a public authority defense has passed.

**2.   The Defendant's Actions Were Not Authorized by Former President Trump and "Foxitis" is Not a Valid Defense**

Regardless of notice, the defendant should be precluded from advancing a public authority defense.  As an initial matter, former President Trump did not have the authority to permit or authorize a conspiracy to obstruct Congress, nor could he have lawfully sanctioned the attack on the United States Capitol on January 6 or any of the other criminal conduct allegedly perpetrated by the defendant.  As then-Chief Judge Howell wrote in rejecting the idea of an entrapment-by-estoppel defense for January 6 defendants:

> [A President] cannot, in keeping with his constitutional function and his responsibilities under Article II, lawfully permit actions that directly undermine the Constitution. Thus, a President cannot, within the confines of his constitutional authority, prevent the constitutionally mandated certification of the results of a Presidential Election or encourage others to do so on his behalf, nor can he direct an assault on the coequal Legislative branch of government. Were a President to attempt to condone such conduct, he would act ultra vires and thus without the force of his constitutional authority. . . . Put simply, even if former President Trump in fact [explicitly directed the rioters' actions,] his statements would not immunize defendants charged with offenses arising from the January 6 assault on the Capitol from criminal liability.

*United States v. Chrestman*, 525 F. Supp. 3d 14, 32–33 (D.D.C. 2021).  The D.C. Circuit came to the same conclusion in *United States v. North*, when addressing Oliver North's contention that President Ronald Reagan authorized his obstruction of Congress in that case.  910 F.2d 843, 879

23

(D.C. Cir. 1990) (per curiam), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990).  The court made clear that "'[n]either the President nor any of [North's] superiors had the legal authority to order anyone to violate the law,' particularly if such 'orders,' explicit or implicit, represented nothing more than [the President's] desires."  *Id.* at 891 n.24.

Chief Judge Howell's opinion in *Chrestman* adopted a four-part test from the Tenth Circuit, which limits the entrapment-by-estoppel defense to narrow circumstances.  *Chrestman*, 525 F. Supp. 3d at 33 (citing *United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018)).  "To win an entrapment-by-estoppel claim, a defendant criminally prosecuted for an offense must prove (1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation."  *Id.* (quoting *Cox*, 906 at 1191).

Here, the defendant cannot meet the requirements of the Tenth Circuit's four-part test.  To begin, the defendant cannot point to any government official who advised the defendant that his conduct was legal.  In post-January 6 interviews, the defendant has suggested that his conduct was in response to directives from former President Trump.[4]  But former President Trump's speech on January 6, 2021, could not satisfy the first prong of the Tenth Circuit's test.  Former President Trump did not state that the U.S. Capitol grounds were no longer "restricted" under 18 U.S.C.

---

[4] *See Man who claimed 'Foxitis' prompted him to rush Capitol says he believed 'America was being robbed of a president'*, CNN (May 10, 2021) at 0:12, *available at* https://www.cnn.com/2021/05/10/politics/foxitis-us-capitol-riot-cnntv/index.html (hereinafter "May 10, 2021 CNN Interview").

§ 1752(a); nor that it would not constitute obstruction of the proceeding to enter the Capitol building under 18 U.S.C. § 1512(c)(2); nor that property inside the Capitol building was not government property, and so could be destroyed notwithstanding 18 U.S.C. § 1361. Former President Trump did not purport to reinterpret a specific criminal statute to render the defendant's conduct noncriminal. He therefore did not "actively mis[lead]" the defendant "about the state of the law defining the offense." *Cox*, 906 F.3d at 1191. *See also United States v. Sheppard*, No. 21-cr-203, ECF No. 63 at 17, 19 (D.D.C. Dec. 28, 2022) (Bates, J.) ("Sheppard's public authority defense as he describes it will fail because former President Trump's statements did not amount to an express or implied statement of law" and "there is simply no indication that Trump informed the protestors that doing so would be legal, as required to make out either defense.").

And even if the defendant were able to point to such a government official, which he cannot, the defendant could not show that his reliance was reasonable. "[R]easonable reliance occurs" only "if 'a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries.'" *United States v. Lynch*, 903 F.3d 1061, 1077 (9th Cir. 2018) (quoting *United States v. Batterjee*, 361 F.3d 1210, 1216–17 (9th Cir. 2004)); *see United States v. Corso*, 20 F.3d 521, 528 (2d Cir. 1994) (adopting "sincerely desirous" standard). It is objectively unreasonable to conclude that then-President Trump could authorize citizens to break into the Capitol and interfere with the Electoral College proceedings that were being conducted. Indeed, the Supreme Court has made clear that an entrapment-by-estoppel defense is not available in cases where a government official's directive constitutes a "waiver of law" beyond the official's lawful authority. *Cox v. Louisiana*, 379 U.S. 559 (1965) (drawing an "obvious[]" distinction between identifying an area for lawful protest and "allowing one to commit, for example, murder, or robbery"). Any "instruction" from a President

to wage an unlawful assault on the Legislative branch of government would exceed the President's constitutional authority. *See Chrestman*, 525 F. Supp. 3d at 33 ("Were a President to attempt to condone such conduct, he would act *ultra vires* and thus without the force of his constitutional authority." (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588–89 (1952))). This is because "no President may unilaterally abrogate criminal laws duly enacted by Congress as they apply to a subgroup of his most vehement supporters." *Chrestman*, 525 F. Supp. 3d at 32. Accordingly, any such argument would be *per se* unreasonable.

The defendant's conduct was plainly beyond any conduct that could be reasonably sanctioned. The defendant should be prohibited from making arguments or attempting to introduce irrelevant evidence that former President Trump or any other government official authorized the defendant's conduct at the Capitol.

Likewise, the same argument applies to any defense based on "Foxitis," which the defendant suggested in media interviews following January 6, and which the defendant's former counsel raised at the defendant's initial appearance. Initial Appearance Tr. at 18–19, ECF No. 7 (May 10, 2021) ("And for the next approximate six months, Fox television played constantly. And he became hooked, which I call Foxitis or Foxmania, and became interested in the political aspect and started believing what was being fed to him."). Along the same lines, in an interview with CNN, the defendant claimed that he "got wrapped up in what was being told to [him], . . . and what was on the TV," May 10, 2021 CNN Interview, at 0:41, and as a result "truly believed that [former President Trump] won the election" *Id.* at 1:24. "Foxitis" and "Foxmania," is not a legally cognizable defense, and the Court should prohibit the defendant from asserting "Foxitis" or "Foxmania" as a basis to introduce otherwise irrelevant evidence or to argue to the jury than any such defense exists.

Even if the defendant truly believed media reports that the election had been stolen from former President Trump, a reasonable person would still know that they were not legally authorized to break into the U.S. Capitol and interfere with the Electoral College proceedings. "The point is not that the defendant needs to understand that [his] actions are *morally* wrong; []he needs only understand that [his] actions are *unlawful*." *United States v. Rachel Powell*, ECF No. 110 at 18 (D.D.C. July 18, 2023) (Lamberth, J.) (emphasis in original). A sincere belief that former President Trump was entitled to remain in office cannot have undermined the defendant's understanding "that it was unlawful to vindicate that perceived injustice by engaging in mob violence to obstruct Congress," and is therefore irrelevant. *Id.* at 17. Arguments based on "Foxitis" or "Foxmania" amount to nothing more than a rebranded entrapment or public authority defense; indeed, they fall even further short of the mark than do the public authority and entrapment arguments described above because at least those defenses rely on statements and actions made by a public authority—which cable news and social media are not.

### 3.   The Defendant's Actions Were Not Authorized by Law Enforcement

The same reasoning applies to any argument based on acts or omissions of the U.S. Capitol Police or other law enforcement: "the logic in *Chrestman* that a U.S. President cannot unilaterally abrogate statutory law applies with equal force to government actors in less powerful offices, such as law enforcement officers protecting the U.S. Capitol Building." Memorandum and Order, *United States v. Williams*, No. 21-cr-377-BAH, at *2 (D.D.C. June 8, 2022), ECF No. 87.  Even if the defendant could establish that a member of law enforcement told him that it was lawful to enter the Capitol building or allowed him to do so, the defendant's reliance on any such statement would not be reasonable in light of the "obvious police barricades, police lines, and police orders restricting entry at the Capitol." *Chrestman*, 525 F. Supp. 3d at 32.

In addition to prohibiting any defense arguments that law enforcement actively communicated to the defendant that entering the Capitol building or grounds was lawful, the Court should also bar the defendant from arguing that any failure to act by law enforcement rendered his conduct legal. The same reasoning that applied in *Chrestman* again applies here. That is, like the Chief Executive, a Metropolitan Police Officer or U.S. Capitol Police Officer cannot "unilaterally abrogate criminal laws duly enacted by Congress" through his or her purported inaction. *Chrestman*, 525 F. Supp. 3d at 33. An officer cannot shield an individual from liability for an illegal act by failing to enforce the law or ratify unlawful conduct by failing to prevent it. As Chief Judge Howell explained in the context of another January 6 case, "[s]ettled caselaw makes clear that law officer inaction—whatever the reason for the inaction—cannot sanction unlawful conduct." *Williams*, No. 21-cr-377-BAH, at *3.

### 4. The Defendant's Actions Were Not Caused by Agent Provocateurs

Defendants in other January 6 cases have introduced arguments that their actions were encouraged by agents of the government. Absent a proffer of evidence, such that the Court may evaluate the relevance of any such line of argument, the defendant should be precluded from making any such arguments to the jury, whether during a jury address or on cross-examination. *Cf. Michelson v. United States*, 335 U.S. 469, 481 (1948) (approving of the trial court's "scrupulous" efforts to guard against the asking of "a groundless question to waft an unwarranted innuendo into the jury box.").

### D. Jury Nullification

The Court should prohibit the defendant from making arguments or attempting to introduce irrelevant evidence that encourages jury nullification. As the D.C. Circuit has made clear:

A jury has no more "*right*" to find a "guilty" defendant "not guilty" than it has to find a "not guilty" defendant "guilty," and the fact that the former cannot be corrected by a court,

while the latter can be, does not create a right out of the power to misapply the law.  Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power.

*Washington*, 705 F.2d at 494.  Evidence that serves only to support a jury nullification argument or verdict has no relevance to guilt or innocence.  *See United States v. Gorham*, 523 F.2d 1088, 1097–98 (D.C. Cir. 1975); *see also United States v. Funches*, 135 F.3d 1405, 1409 (11th Cir. 1998) ("No reversible error is committed when evidence, otherwise inadmissible under Rule 402 of the Federal Rules of Evidence, is excluded, even if the evidence might have encouraged the jury to disregard the law and to acquit the defendant.").  In particular, the Court should permit no argument, evidence, or questioning regarding the following topics, which would serve only to encourage jurors to decide the case based on factors other than the facts and the law.

### 1.  Use of Federal Resources and the Volume and Timing of Discovery

The United States requests that the Court preclude the defendant from arguing or eliciting testimony regarding the volume, nature, or timing of discovery or the volume and type of federal resources used in the investigation and prosecution of the case.  Any attempt by the defendant to comment on discovery or allocation of federal resources is irrelevant and unduly prejudicial.  Fed. R. Evid. 401, 402, 403; *see* Minute Order Granting U.S. Omnibus Mot. in Limine, ECF No. 167, *United States v. Badalian*, No. 1:21-cr-246-ABJ (Feb. 27, 2023) (granting the government's Omnibus Motion in Limine, ECF No. 134, which included the same motion *in limine* regarding federal resources and discovery presented here).  Instead, such arguments and testimony invite the jury to improperly consider its feelings towards the United States and the government's decision making about how to allocate resources.

### 2.  The Defendant's Claimed Good Character

*Character Generally.*   The Court should exclude evidence and argument from the

defendant introducing reputation or opinion evidence that the defendant is generous, charitable, family-oriented, religious, or a community participant.  Evidence that a defendant possesses certain favorable character traits is admissible only when the trait is "pertinent" to the offense charged.  Fed. R. Evid. 404(a)(2)(A); *see, e.g.*, *United States v. Harris*, 491 F.3d 440, 447 (D.C. Cir. 2007); *United States v. Santana-Camacho*, 931 F.2d 966, 967–68 (1st Cir. 1991) (Breyer, C.J.).  But the defendant may not provide evidence of possessing a generally good character.  *See, e.g.*, *United States v. Hill*, 40 F.3d 164, 168 (7th Cir. 1994) (court properly excluded "classic character evidence offered to prove that [defendant] had a good character and acted in conformity therewith").  Such evidence only promotes jury nullification and is not allowable.  *See United States v. Joseph*, 567 F. App'x 844, 849 (11th Cir. 2014) ("[W]hen the district court restricted defense counsel's comments about [defendant]'s honor and social contributions—comments that were part of his jury nullification efforts—the court did not deny [defendant] the opportunity to make a legally tenable argument.  Instead, it kept him from making impermissible arguments.").  Because none of the above characteristics are relevant to the charged offenses, the Court should exclude any evidence and argument addressing these character traits.

*Specific Instances of Conduct.*  The Court should also exclude evidence and argument of specific instances of the defendant's good character, such as, for example, caring for family members, donations, attending religious services, performing charitable or civic work, or other forms of generosity.  Rule 405(b) makes clear that unless a defendant's character or character trait is "an essential element of a charge, claim, or defense," he may not offer evidence of specific instances of good conduct.  Fed. R. Evid. 405(b).  Because instances of good conduct are not relevant to an essential element of a charge, claim, or defense in this case, evidence of such should be excluded.  *See United States v. Bernard*, 299 F.3d 467, 476 (5th Cir. 2002) (approving court's

sentencing instruction that jurors should not "consider the religious views of the defendants"); *Santana-Camacho*, 931 F.2d at 967 (excluding evidence that defendant was a good family man and a kind man because it was not a trait relevant to the offense); *United States v. Nazzaro*, 889 F.2d 1158, 1168 (1st Cir. 1989) (holding evidence of "bravery, attention to duty, perhaps community spirit" were "hardly 'pertinent' to the [charged] crimes"); *United States v. Morison*, 622 F. Supp. 1009, 10111 (D. Md. 1985) (holding "patriotism" was not a relevant trait to the charged offense).

### 3.  The Defendant's Claimed Ignorance of the Law

The Court should exclude evidence and argument from the defendant that he was ignorant of the illegality of the charged conduct.  "The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system." *Cheek v. United States*, 498 U.S. 192, 199 (1991).  While there is a "narrow exception," *United States v. Brooks*, 681 F.3d 678, 700 n.18 (5th Cir. 2012), that exception is "reserved . . . to limited types of statutory violations involving 'complex' statutes—namely those governing federal tax law and antistructuring transactions."  *United States v. Kay*, 513 F.3d 432, 448 (5th Cir. 2007); *see Bryan v. United States*, 524 U.S. 184, 195 (1998).

Because ignorance of the law is not a defense to any of the charged offenses, any evidence and argument that the defendant did not know that the charged conduct was illegal should be

excluded as irrelevant, and the defendant should not be permitted to ask witnesses if they knew his conduct was illegal or whether he intended to commit crimes.[5]

### 4. Penalties and Collateral Consequence

The Court should exclude evidence and argument of the potential penalties or consequences the defendant faces if he is convicted, including: (a) the maximum penalties; (b) that the defendant could be incarcerated; (d) that the defendant would become a felon and could be prohibited from obtaining some types of jobs or lose certain rights; and (e) any mention of the consequences of a conviction for the defendant's family.

The potential penalties faced by the defendant are irrelevant to the jury's determination of guilt or innocence. *See Shannon v. United States*, 512 U.S. 573, 579 (1994) ("[A] jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" (quoting *United States v. Rogers*, 422 U.S. 35, 40 (1975))). "[P]roviding jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.* at 579. Accordingly, the D.C. Circuit has held that "the jury is not to consider the potential punishment which could result from a conviction." *United States v. Broxton*, 926 F.2d 1180, 1183 (D.C. Cir. 1991); *see, e.g.*, *United States v. Greer*, 620 F.2d 1383, 1384 (10th Cir. 1980) ("The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial."). Any discussion of possible penalties would serve no purpose beside improperly inviting the jury to render a verdict based on sympathy for the defendant—that is, to

---

[5] The United States understands that an element of the 18 U.S.C. § 1512(c)(2) offense is that the defendant acted "corruptly," which the United States may prove by showing the defendant's consciousness of wrongdoing. *See United States v. Robertson*, No. 22-3062, 2023 WL 8010264, at *5 (D.C. Cir. Oct. 20, 2023). That intent requirement, however, does not require that the United States prove that the defendant was aware of any specific criminal statute that his conduct violated.

engage in jury nullification.  *See United States v. Bell*, 506 F.2d 207, 226 (D.C. Cir. 1974) ("[E]vidence which has the effect of inspiring sympathy for the defendant or for the victim . . . is prejudicial and inadmissible when otherwise irrelevant.") (quoting 1 Wharton's Criminal Evidence 164 at 304 (13th ed. 1972)); *United States v. White*, 225 F. Supp. 514, 519 (D.D.C 1963) ("The proffered testimony (which was clearly designed solely to arouse sympathy for defendant) was thus properly excluded.").

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant the requested relief or, if the Court reserves ruling, to consider the above arguments when the relevant issues arise during trial.

Date: November 28, 2023

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ Terence Parker
TERENCE PARKER
Trial Attorney
United States Attorney's Office for the
District of Columbia (detailee)
New York Bar No. 5775192
Terence.Parker3@usdoj.gov
(202) 803-1600

/s/ Craig Estes
CRAIG ESTES
Assistant United States Attorney
United States Attorney's Office for the
District of Columbia (detailee)
Massachusetts Bar No. 670370

craig.estes@usdoj.gov
(617) 748-3100


*/s/ Mindy Deranek*
MINDY DERANEK
Assistant United States Attorney
United States Attorney's Office for the
District of Columbia
Washington State Bar No. 43085
Mindy.Deranek@usdoj.gov
(202) 252-7776

## <u>CERTIFICATE OF SERVICE</u>

On this 28th day of November, 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<u> /s/ *Terence Parker*        </u>
Terence Parker
Trial Attorney (detaliee)